NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MYLAN INC. and MYLAN PHARMACEUTICALS INC., | Civil Action No. 10-cv-4809 |
| Plaintiffs, | **OPINION** |
| v. | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE, SMITHKLINE BEECHAM P.L.C., and SMITHKLINE BEECHAM (CORK) LIMITED, | |
| Defendants. | |

PISANO, District Judge

Presently before the Court are three (3) post-trial motions: (1) Plaintiffs', Mylan Inc. and Mylan Pharmaceuticals, Inc. (collectively "Plaintiff" or "Mylan") motion for permanent injunctive relief and an accounting by Defendants, Smithkline Beecham Corporation d/b/a Glaxosmithkline, Smithkline Beecham P.L.C., and Smithkline Beecham (Cork) Limited (collectively "Defendants" or "GSK") [docket #384]; (2) Plaintiffs' motion for prejudgment interest pursuant to Federal Rule of Civil Procedure 59(e) [docket #394]; and (3) Defendants' motion for judgment as a matter of law ("JMOL"), new trial, and/or remittitur [docket #399].  The parties have each opposed the respective motions.  The Court considered the papers filed by the parties and rules on the written submissions without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, this Court grants Plaintiffs' motion for permanent injunctive relief and an accounting; grants in part and denies in part Plaintiffs' motion for prejudgment interest; and denies Defendants' motion for judgment as a matter of law, new trial, and/or remittitur.

1

## I. BACKGROUND AND PROCEDURAL HISTORY

In June 2007, GSK sued Mylan for infringing U.S. Patent No. 7,229,640 ("the '640 patent"), which relates to the antidepressant drug Paxil CR. *Mylan Inc. v. SmithKline Beecham Corp.*, CIV.A. 10-4809 JAP, 2012 WL 603804 (D.N.J. Feb. 23, 2012) *aff'd in part, vacated in part, rev'd in part*, 723 F.3d 413 (3d Cir. 2013). To settle the '640 patent litigation, GSK and Mylan entered into a Patent License and Settlement Agreement ("the License Agreement") on August 10, 2007. *Id.* The original License Agreement granted Mylan an exclusive license (even as to GSK) under the '640 patent to sell generic Paxil CR for the remaining life (approximately nine (9) years) of the '640 patent in exchange for a royalty. *Id.* In light of Federal Trade Commission ("FTC") concerns surrounding the exclusivity of the agreement, the parties had further negotiations and subsequently executed a Second Amendment to the License Agreement in September 2007. See Declaration of Gary D. Adamson ("Adamson Dec.") at Ex. A., *Trial Tr.* 267:7-24 (Ondos), 269:6-13 (Ondos), 503:20-504:19 (Parker). The Second Amendment provided two (2) limited exceptions to Mylan's exclusivity under the License Agreement: (1) where GSK was notified that a Third Party generic pharmaceutical company had filed an Abbreviated New Drug Application ("ANDA") for Paroxetine CR, and GSK initiated a patent infringement action, GSK could settle that litigation by entering into a license agreement; or (2) GSK or its Affiliate could commence marketing and selling its own AG Paxil CR no less than two (2) years after Mylan launched its generic Paroxetine CR products. Adamson Dec. at Ex. A, *Trial Tr.* 270:7-272:7 (Ondos); 513:3-515:11 (Parker).

On July 1, 2010, GSK settled a litigation with Apotex and as part of this settlement, GSK agreed to enter into a supply and distribution agreement whereby GSK would supply Apotex with paroxetine CR, which Apotex would then market and sell to downstream customers as AG Paxil

CR. Adamson Dec. at Ex. A, *Trial Tr.* 1127:12-1128:13 (Siek). After learning that Apotex was attempting to take orders from generic paroxetine CR customers, Mylan filed a Complaint against GSK and Apotex on September 20, 2010, alleging four (4) causes of action: (1) breach of contract by GSK; (2) breach of the implied covenant of good faith and fair dealing by GSK; (3) inducement to breach a contract by Apotex; and (4) tortious interference with a contract by Apotex. See *Mylan*, 2012 WL 603804, at *3. Mylan also sought a preliminary injunction against GSK and Apotex seeking to prohibit GSK's manufacturing, distributing, and selling of authorized generic Paxil CR and to prevent the launch of Apotex's authorized generic Paxil CR. *Id.* This Court denied Mylan's preliminary injunction[1] and on October 28, 2010, Apotex commenced marketing and selling AG Paxil CR manufactured and supplied by GSK in competition with Mylan. Adamson Dec. at Ex. A, *Trial Tr.* 914:25-915:4 (Gleason).

The crux of this litigation has focused on whether GSK breached the second exception of the Second Amendment to the License Agreement. Apotex did not file an ANDA; therefore, the parties have not disputed that the first exception (which permits GSK to license Paroxetine CR by way of a settlement with an ANDA filer) does not apply. Further, the parties agree that Apotex is not an affiliate of GSK. Thus, the central issue in this case has been whether the parties intended the second exception (which permits GSK or its Affiliate to market and sell AG Paxil CR after two (2) years subsequent to Mylan's launch) to mean that GSK may market and sell through a third party generic manufacturer such as Apotex. Mylan alleged that the parties intended the second exception to mean that only GSK could market and sell to downstream customers and that GSK breached the License Agreement because the supply and distribution agreement with Apotex

---

[1] Mylan sought a stay of this Court's decision, which was denied. [docket #41 at 32:16-34:3]. Mylan then filed an emergency motion to the Third Circuit to enjoin GSK from selling AG Paxil CR pending its appeal, which the Third Circuit denied. Thereafter, Mylan abandoned its appeal, and returned to this Court for discovery.

did not constitute marketing and selling. GSK on the other hand, contended that its supply and distribution agreement with Apotex was in fact GSK marketing and selling as intended by the parties, and because the second exception did not limit to whom GSK could market and sell, it was not in breach of the License Agreement.

To this effect, on November 4, 2011, GSK filed a motion for summary judgment [docket #183] arguing that the plain language of the License Agreement was clear and unambiguous in that it permitted GSK to enter into its supply and distribution agreement with Apotex.[2] On February 23, 2012, this Court agreed with GSK and granted its motion for summary judgment, holding that the License Agreement between Mylan and GSK was clear and unambiguous and therefore, the terms therein should be given their plain and ordinary meaning. See *Mylan*, 2012 WL 603804, at *5 (". . . [T]he Court concludes that the language of the License Agreement is clear and permits GSK to market and sell to whomever it wants, including Apotex."). Mylan appealed this ruling, and on July 22, 2013, the Third Circuit reversed on the breach of contract claim, holding that a genuine issue of material fact existed regarding whether the License Agreement limited to whom GSK could market and sell after Mylan's two (2) year period of generic exclusivity, precluding summary judgment on Mylan's breach of contract claim against GSK under New Jersey law.[3] *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 420 (3d Cir. 2013). As such, the Third Circuit remanded the case to this Court to proceed to trial on Mylan's breach of contract claim.

The parties proceeded to trial on the breach of contract claim on March 13, 2014. After nearly two (2) weeks, the trial concluded on March 25, 2014, and the jury returned a verdict in

---

[2] On this same day, Apotex moved for summary judgment on other grounds [docket #178], which was granted by this Court and later affirmed by the Third Circuit. Apotex is no longer a party to the case nor is it the subject of any motion(s) currently pending before the Court.

[3] The Third Circuit affirmed the grant of summary judgment on Mylan's remaining claims.

4

favor of Mylan finding that GSK's agreement with Apotex breached the License Agreement and entitled Mylan to $106,700,000 in damages.[4] The instant motions followed.

## II. DISCUSSION

### A. Motion for Permanent Injunctive Relief and an Accounting

#### a. Legal Standard

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006) (citing *Weinberger v. Romero—Barcelo,* 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court . . ." and is based on traditional equitable considerations surrounding the unique set of circumstances in each case. *Id.* at 391-94.

Further, where a defendant continues to engage in the precise conduct that was found by the jury to constitute a breach, it is within a courts discretion to order an accounting to calculate supplemental damages for the continued harm incurred after the return of a jury verdict. See *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc.*, 821 F. Supp. 2d 681, 697 (D.N.J.

---

[4] Prior to the jury rendering its verdict, both parties moved for judgment as a matter of law pursuant to Rule 50(a) which the Court denied. *Trial Tr.*, 1691:18-21 (". . . [THE COURT:] [T]his is a case where if there were ever fact issues to be decided by a jury this is it. With all respect, both sides' motions are denied.").

2011) *aff'd and remanded sub nom. Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354 (Fed. Cir. 2014) (where jury returned a verdict in favor of Plaintiff and Defendant continued to sell generic product, the Court ordered an accounting to calculate Plaintiff's supplemental damages.).

### b. Analysis

"The first two prongs of the permanent injunction test are often considered together. Although irreparable injury and inadequacy of legal remedy are not always the same, demonstrating that plaintiff will suffer irreparable injury is a "common method" of showing there is no adequate legal remedy." *Port Drivers Fed'n 18, Inc. v. All Saints Exp., Inc.*, 757 F. Supp. 2d 443, 460 (D.N.J. 2010) (citation omitted). Here, Mylan has demonstrated that it suffered an irreparable injury and that monetary damages are inadequate to compensate for such injury. Specifically, GSK has continued to engage in the precise conduct that the jury found to be a breach. Stated differently, until such time that GSK ceases supplying Apotex with Paroxetine CR, Mylan will be forced to continuously seek legal action in order to enforce its rights under the License Agreement. Not only would this be a waste of judicial resources, but it would cause Mylan to suffer irreparable harm. See *Port Drivers Federation 18, Inc.,* 757 F. Supp. at, 460-61 ("The burden of future litigation 'might, in and of itself, constitute irreparable harm' because a party should not have to continue to re-litigate issues that have already been decided.'") (quoting *Southeast Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission*, 210 F. Supp. 2d 689, 726 (E.D. Pa. 2002)); see also *The Prudential Ins. Co. of Am. v. Massaro*, No. Civ. A. 97-2002, 2000 WL 1176541, at *10 (D.N.J. Aug. 11, 2000) (finding that "[a] sufficient showing of a threat of irreparable injury persists to sustain a permanent injunction" where the proven facts "could give no one confidence that [the defendant] will avoid future breaches.").

Further, it is clear that monetary damages are inadequate to compensate Plaintiff for its ongoing injuries. Even though Mylan was awarded monetary damages by the jury, this amount will not prevent the ongoing breach(es) by GSK, and the amount of future damage(s) Mylan will suffer as a result will continue to remain uncertain. See *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 624 (E.D. Va. 2010) *aff'd sub nom. Signature Flight Support Cor. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776 (4th Cir. 2011) ("[M]onetary damage in this case is inadequate because it would not prevent the future injury that would be suffered by Plaintiff without the injunction. It would be neither adequate [n]or efficient to have to require Plaintiff to file a breach of contract in the future to be able to recover for its loss.").

Moreover, in considering the balance of hardships between Mylan and GSK, a remedy in equity is warranted. Indeed, any potential harm that GSK may suffer as a result of an injunction was preventable. After the conclusion of the trial, GSK continued supplying Apotex with Paroxetine CR and knowingly engaged in the behavior that the jury found to be a breach of the License Agreement. Thus, by entering an injunction, the Court is not harming GSK but rather, is forcing it to cease engaging in conduct that it should have ceased already. See *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc.*, 821 F. Supp. 2d 681, 695 (D.N.J. 2011) *aff'd and remanded sub nom. Sanofi-Aventis Deutschland GmbH v. Glenmark Pharm. Inc., USA*, 748 F.3d 1354 (Fed. Cir. 2014) ("Any harms Defendants may suffer as a result of an injunction were almost entirely preventable and were the result of its own calculated risk . . ." (citation omitted)). Last, the public will not be disserved by enjoining GSK from supplying Apotex with Paroxetine CR. Rather, Mylan has demonstrated that it has the ability to fill all demand for the product and more importantly, there is a significant public interest in recognizing and enforcing settlement agreements. Adamson Dec at Ex. I, *Workman Dep. Tr.* 115:25-116:5; see also, *Healix Infusion*

7

*Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 740 (S.D. Tex. 2010) ("When individuals ignore contractual obligations, particularly settlement agreements, the public is disserved."). Accordingly, the Court finds that enjoining GSK from supplying Apotex with Paroxetine CR in accordance with the terms of the License Agreement is warranted.[5]

Mylan also requests an accounting to determine the amount of supplemental damages it has incurred as a result of GSK's ongoing breach. GSK opposes this contention, arguing that this request is premature because the jury verdict may not remain in place following post-trial motions and, if necessary, an appeal to the Third Circuit. Given that the Court is addressing all of the post-trial motions in this Opinion, Mylan's request for an accounting is not premature. Further, as discussed in detail below, the jury verdict will remain in place and as such, Mylan is entitled to an accounting to calculate GSK's sales of AG Paxil CR since September 30, 2013, and Apotex's resales of AG Paxil CR since March 31, 2014. See *Sanofi-Aventis Deutschland GmbH*, 821 F. Supp. 2d at 697.

### B.   Motion for Prejudgment Interest Pursuant to Rule 59(e)

#### a.   Legal Standard

For damages arising from a breach of contract, New Jersey law[6] provides courts with discretion to award prejudgment interest based on "'equitable principles,' where 'the basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question.'" *Carolee, LLC v. eFashion Solutions, LLC*, 2:12-CV-02630 WHW, 2013 WL 5574594, *4 (D.N.J. Oct. 9, 2013); see also *Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 642 (D.N.J. 1998) ("The purpose of awarding prejudgment interest is to compensate the claimant for

---

[5] It should be noted that GSK is not enjoined from marketing and selling authorized generic Paxil CR itself or through an Affiliate as defined in the License Agreement with Mylan.
[6] There is no dispute that New Jersey law governs the License Agreement and the Second Amendment.

the loss of income the money owed would have earned if payment had not been delayed."). If a court determines that an award of prejudgment interest is appropriate, the court must then balance the equities to determine an appropriate rate of interest and the date from which interest runs. See *Feit v. Great-W. Life & Annuity Ins. Co.*, 460 F. Supp. 2d 646, 649-50 (D.N.J. 2006) (court tasked with employing its discretion to decide the appropriate rate of prejudgment interest); *Cnty. of Essex v. First Union Nat. Bank*, 186 N.J. 46, 61-62, 891 A.2d 600, 609 (2006) (trial court, in its discretion, determines the date on which prejudgment interest starts to accrue in contract cases).

While the beginning date from which interest begins to run is discretionary, courts typically do not award prejudgment interest for the time that accrued during an appeal. See *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, C.A. No. 96-01949, 2002 WL 34684848, at *5 (D.N.J. Dec. 17, 2002) (requiring defendant to pay prejudgment interest during "appellate proceedings does not serve the policy, spirit and intent of the [prejudgment interest] rule." (internal quotation marks omitted)). Rather, suspending the prejudgment interest period during the pendency of an appeal is also discretionary with the court. *Dall'Ava v. H.W. Porter Co.*, 199 N.J. Super. 127, 131, 488 A.2d 1036, 1038 (App. Div. 1985) ("As observed by Judge Conford in his dissent in *Busik* [*v. Levine*, 63 N.J. 351, 383 (N.J. 1973) recognizing that 'there might be intervening appeals between institution of action and final judgment, inordinately protracting the interest payment period'] there are varied situations, not involving fault of a plaintiff, where equitable considerations favor the denial, or partial allowance, of prejudgment interest.").

Moreover, the statutory formula provided by New Jersey Court Rule 4:42-11(a)(ii) is the appropriate benchmark for determining the prejudgment interest rate. *Carolee, LLC*, 2013 WL 5574594, *4-5. While Rule 4:42-11(a)(iii) provides that judgments exceeding the monetary limit of the Special Civil Part (or, $15,000) are subject to a two percentage point increase, "[t]he Third

Circuit has warned district courts not to blindly adopt the statutory formula for *post* judgment interest when calculating *pre*-judgment interest." *Id.* at *5 (citing *Gleason v. Norwest Mortgage, Inc.*, 253 F. App'x 198, 204 (3d Cir. 2007)). Rather, "[l]ike the decision whether to award interest at all, deciding the rate of interest depends on the equities of the case." *Id*.

### b. Analysis

Here, the equities of this case weigh in favor of awarding Mylan prejudgment interest. Courts in this district applying New Jersey law have awarded prejudgment interest for breach of contract cases where, as here, the plaintiff "was deprived of funds without receiving that which was promised in return." *Miller v. Butler*, 1:12-CV-01004 RBK/JS, 2014 WL 585409, at *8 (D.N.J. Feb. 14, 2014); *see e.g.*, *Devine v. Advanced Computer Concepts Inc.*, CIV. 08-875 GEB, 2009 WL 78158, at *2 (D.N.J. Jan. 9, 2009) (awarding prejudgment interest in a breach of contract case because the plaintiff had "been deprived of the use of his funds without receiving the Simulator, which Defendant promised to deliver. In contrast, Defendant has enjoyed the use of Plaintiff's funds without completing its end of the bargain."); *Napp Technologies, L.L.C. v. Kiel Labs., Inc.*, 72 Fed. R. Serv. 3d 505 (D.N.J. 2008) (awarding prejudgment interest in a breach of contract case because plaintiff was improperly denied the use of its money). At the conclusion of the trial, the jury determined that GSK breached its contract with Mylan, causing Mylan to suffer $106,700,000 in damages, which is the precise amount calculated by Mylan's damages expert as the lost profits from sales made by Apotex. Adamson Dec. at Ex. A, *Trial Tr*. 914:20-916:8; 986:9-987:4 (Gleason) (testifying that Mylan's lost sales profits totaled $106.7 million for the period from October 2010 through March 2014). The damages awarded therefore represent the profits that Mylan would have earned beginning in 2010 but for GSK's breach and as such, an

award of interest will do no more than make Mylan whole by compensating Plaintiff for not having had the benefit of these profits due to GSK's breach.

While the Court agrees with Mylan that it is entitled to prejudgment interest, it disagrees with the contention that Mylan is entitled to a two (2) percentage point increase. Rather, in balancing the equities, the Court is unaware of any "unusual circumstances to warrant an enhancement of the simple interest rate." *Litton Indus., Inc. v. IMO Indus., Inc.*, 200 N.J. 372, 391, 982 A.2d 420, 431 (2009) (internal quotation marks omitted). Further, the Court agrees with GSK that Mylan's period of prejudgment interest should be suspended during the time in which Mylan pursued an appeal. This Court granted summary judgment in GSK's favor on February 23, 2012. Mylan appealed that judgment, and the Third Circuit reversed and remanded Mylan's breach of contract claim on July 22, 2013. *Mylan, Inc.*, 723 F.3d at 419. Prejudgment interest is not intended to be punitive in nature, see *Lithuanian Commerce Corp. Ltd.*, 2002 WL 34684848 at *2, and thus requiring GSK to pay interest during the time Mylan pursued its appeal does not serve the intent of the prejudgment interest rule. *Id.* (holding that because the defendant was not responsible for the judicial delay, the prejudgment interest accruing during the delay should be suspended). As such, the amount of Mylan's prejudgment interest should not include this sixteen-month timeframe.

### C. Motion for Judgment as a Matter of Law, New Trial, and/or Remittitur

#### a. Legal Standard

A court may grant JMOL if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). On a motion for JMOL, "[t]he question is whether, in viewing the evidence in the light most favorable to the losing party, no jury could decide in that person's favor." *Gomez v. Allegheny Health Servs., Inc.*,

71 F.3d 1079, 1083 (3d Cir. 1995) (citing *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1993)). The Third Circuit does not follow the rule that a scintilla of evidence is enough. *Id.* Rather, "[t]he question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Id.* (citation omitted). Indeed, ". . . [R]ule [50] has not withdrawn from the jury and given to the trial judge the exclusive power of the jury to weigh the evidence and to determine questions of fact." *Lewin v. Metro. Life Ins. Co.*, 394 F.2d 608, 613 (3d Cir. 1968) (citation omitted).

Further, a renewed JMOL motion "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). The Court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Importantly, however, "[n]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *King Pharm., Inc. v. Sandoz, Inc.*, CIV.A. 08-5974 GEB, 2011 WL 601617, at *4 (D.N.J. Feb. 17, 2011) (quoting *Vargo v. Coslet,* 126 Fed. Appx. 533, 534 (3d Cir.2005)); see also *Skill v. Martinez*, 91 F.R.D. 498, 504 (D.N.J. 1981) *aff'd,* 677 F.2d 368 (3d Cir. 1982) ("Generally, courts do not grant new trials unless it is reasonably clear that prejudicial error has occurred, or that substantial justice has not been done.") (citation omitted)). Stated differently, ". . . a district court's discretion to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand." *Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 592 (D.N.J. 1994) *aff'd*, 50 F.3d 1204 (3d Cir. 1995) (internal citation omitted). The reason for this policy is "to ensure that the trial court does not supplant the jury verdict with its own." *Id.* (citing *Fineman v.*

*Armstrong World Indus., Inc.*, 980 F.2d 171, 211 (3d Cir. 1992)). Accordingly, "[a] trial court may not grant a new trial because it would have come to a different conclusion than that reached by the jury." *Lyles v. Flagship Resort Dev. Corp.*, 371 F. Supp. 2d 597, 602 (D.N.J. 2005) (citing *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992)).

Similarly, in determining whether to grant remittitur, "the court's 'obligation is to uphold the jury's award, if there exists a reasonable basis to do so.... [A] court *may not* vacate or reduce the award merely because it would have granted a lesser amount of damages.' *Blakey v. Cont'l Airlines, Inc.*, 992 F. Supp. 731, 734 (D.N.J. 1998) (quoting *Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230 (3d Cir.1989) (emphasis in original)). While "this Circuit has on more than one occasion instructed that the trial court 'should be alert to its responsibility to see that jury awards do not extend beyond all reasonable bounds[,]' . . . a judge's mere belief that the jury was unduly generous is not sufficient to warrant [remittitur]." *Id.* (quoting *Walters v. Mintec/International,* 758 F.2d 73, 82 (3d Cir.1985) (citation omitted)). Simply stated, "[r]emittitur of the verdict is warranted where the jury verdict is clearly unsupported by the evidence and exceeds the amount needed to make the plaintiff whole[.]" *Hayes v. Cha*, 338 F. Supp. 2d 470, 510 (D.N.J. 2004) (citation omitted).

### b. Analysis

The evidence adduced at trial was sufficient to support the jury's verdict that GSK breached the License Agreement as amended. In contract disputes in New Jersey, the ultimate goal is to discover the intent of the parties at the time they entered into the contract. *In re Cendant Corp. Sec. Litig.*, 569 F. Supp. 2d 440, 444 (D.N.J. 2008) (citing *Conway v. 287 Corporate Ctr. Assocs.,* 187 N.J. 259, 270, 901 A.2d 341, 347 (2006)). The Third Circuit explicitly instructed this Court to consider evidence of the circumstances in aid of interpreting the License Agreement. See *Mylan*

*Inc.*, 723 F.3d at 419. In so doing, Mylan introduced ample evidence from which the jury could conclude that Mylan and GSK intended the amended License Agreement to prohibit GSK from supplying a competing generic, like Apotex, with AG Paxil CR for resale to the downstream marketplace.[7] While GSK's position that the contract language does not limit to whom GSK or an Affiliate may sell AG Paxil CR is consistent with this Court's holding at the summary judgment phase, it is contrary to the Third Circuit's explicit holding that there is a "latent ambiguity in the contractual language," and thus extrinsic evidence must be considered to aid in interpreting the same. See *Mylan Inc.*, 723 F.3d at 418-21. The jury's verdict was properly based on its consideration of evidence attendant to the parties' negotiations in addition to the words contained in the agreement.

Further, the Third Circuit's reversal of summary judgment on Mylan's breach of contract claim was premised on the fact that Mylan presented a "*reasonable* alternative reading of the contract." *Id.* at 418 (emphasis supplied). It would defy logic for this Court to now say that the jury's verdict, which was clearly based on Mylan's interpretation of the contract, was *unreasonable*. Rather, the issue was properly left to a fact-finder and ample evidence supported the jury's verdict that this Court must deny GSK's motion for JMOL. Similarly, nothing about the jury's verdict presents a miscarriage of justice or shocks the conscience of the Court. Rather, as

---

[7] Ondos and Parker both testified that Mylan did not intend the Second Amendment to permit GSK to license or otherwise authorize a non-ANDA filer, generic pharmaceutical company to market and sell generic Paroxetine CR. Adamson Dec., Ex. 2, 274:7-275:12, 276:5-23, 278:15-19, 280:4-10, 282:19-283:3 (Ondos); Ex. 3, 489:1-489:7, 513:23-514:8, 516:17-517:4 (Parker). They also testified that Mylan intended the Second Amendment to permit only GSK or an Affiliate to market and sell AG Paxil CR to downstream customers two (2) years after Mylan launched its generic Paroxetine CR products. Adamson Dec., Ex. 2, 274:7-13, 275:13-276:4, 278:15-19 (Ondos); Ex. 3, 488:20-25, 504:2-505:11, 515:4-8 (Parker). Ondos and parker finally testified that they conveyed Mylan's intent to Rea, GSK's primary negotiator, and that Rea understood and agreed with Mylan. Adamson Dec., Ex. 2, 274:14-275:2, 280:7-10, 283:4-21 (Ondos); Ex. 3, 504:20-505:2, 513:7-514:12, 515:9-16 (Parker). Further, Maizel testified that the term "marketing and selling," as used in the Second Amendment, was understood in the pharmaceutical industry to refer to marketing and selling AG Paxil CR to downstream customers and not to include a sale of Paroxetine CR by GSK to Apotex as part of the settlement of a lawsuit. Adamson Dec., Ex. 4, 702:2-24, 722:16-23, 723:1, 728:23-729:5; Ex. 5, 798:11-25, 799:1-7.

the Court expressly stated on the record, "this is a case where if there were ever fact issues to be decided by a jury this is it." *Trial Tr.*, 1691:18-21. A new trial is not warranted merely because the jury disagreed with GSK's interpretation of the contract and found the evidence to weigh in favor of Mylan's understanding. As such, GSK's request for a new trial is denied.

Last, remittitur is improper in this case. Damages in contract cases are meant to "put the injured party in as good a position as . . . if performance had been rendered." *Donovan v. Bachstadt*, 91 N.J. 434, 444, 453 A.2d 160, 165 (1982). GSK argues that Mylan's damages expert, Gleason, failed to account for factors other than Apotex's market entry that show Mylan would not have made all the lost sales it claims and that Mylan failed to mitigate damages. Specifically, GSK contends that Mylan neglected to account for the overall expansion of the generic Paroxetine CR market attributable to sales of the authorized generic. However, Mylan affirmatively showed that Apotex's entry did not expand the market or affect the amount of prescriptions written because that depends on the physician and the patient, not on the "availability of other versions of the medicine in the marketplace." Adamson Dec., Ex. 2, 222:23-223:13 (Korman); Ex. 5, 826:4-20. Further, GSK alleges that Mylan's damage calculation failed to account for the fact that Mylan was experiencing supply issues and would not have been able to supply all generic customers with Paroxetine CR. The Court disagrees, however, as Mylan adduced sufficient evidence showing that the retail market never ran out of product and Mylan's alleged supply issues would not have prevented it from fulfilling all orders for generic Paroxetine CR. Adamson Dec., Ex. 5, 832:8-838:8, 902:11-25 (Workman); 940:13-941:22 (Gleason).

Similarly, GSK argues that no reasonable jury could have concluded that Mylan properly mitigated its damages, relying on Mylan's decision not to lower its prices to customers that Apotex targeted. Again, however, Mylan produced evidence and explained in detail the decision not to

meet Apotex's prices represented a responsible business decision in light of Apotex's history as an aggressive competitor in the marketplace. Adamson Dec., Ex. 5, 807:21-811:25. It is not for this Court to question Mylan's strategic business decisions, particularly where the jury verdict is clearly supported by the evidence. As such, GSK's motion for remittitur must be denied.

### III. CONCLUSION

For the reasons outlined above, this Court this Court grants Plaintiffs' motion for permanent injunctive relief and an accounting [docket #384]; grants in part and denies in part Plaintiffs' motion for prejudgment interest [docket #394]; and denies Defendants' motion for judgment as a matter of law, new trial, and/or remittitur [docket #399]. An appropriate Order accompanies this Opinion.

Dated:   July 16, 2014                                          /s/ Joel A. Pisano
                                                                JOEL A. PISANO, U.S.D.J.